## STATE OF MARYLAND, Plaintiff,

### Commonwealth of Virginia and State of Delaware, Intervenor-Plaintiffs,

v.

### Russell E. TRAIN, Administrator, U. S. Environmental Protection Agency, and Daniel J. Snyder, III, Regional Administrator, U. S. Environmental Protection Agency, Region III, Defendants.

### Civ. A. No. 75–1731.

United States District Court, D. Maryland.

May 10, 1976.

Francis B. Burch, Atty. Gen., Warren K. Rich, Deputy Atty. Gen., Annapolis, Md., for plaintiff State of Md.

Andrew P. Miller, Atty. Gen., James E. Moore, Asst. Atty. Gen., Richmond, Va., for intervenor plaintiff Com. of Va.

Richard R. Wier, Jr., Atty. Gen., Thomas Fenton Smith, Englewood, Colo., June D. MacArtor, Deputy Atty. Gen., Dover, Del., for intervenor State of Del.

John W. Sheldon, Asst. U. S. Atty., Baltimore, Md., James A. Rogers, Asst. Gen. Counsel, EPA, Washington, D. C., Ann Joseph, EPA, Philadelphia, Pa., Gary B. Randall, Fred R. Disheroon, Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM

GESELL, District Judge.*

By this action Maryland seeks to prevent Camden, New Jersey, from using an ocean-dumping site in the Atlantic Ocean approximately 50 miles southeast of the mouth of Delaware Bay. This so-called Cape May site is being used by Philadelphia as well as Camden for the dumping of sewage sludge pursuant to interim ocean dumping permits issued by the Environmental Protection Agency (EPA). Defendants answered the complaint and filed a motion to dismiss for failure to join indispensable parties. On March 18, 1976, this Court denied that motion. The matter is now before the Court on cross-motions for summary judgment. An extensive record reflecting the underlying administrative hearings and containing various affidavits and depositions has been reviewed. The motions were fully briefed and argued.[1]

On October 23, 1972, Congress enacted the Marine Protection, Research and Sanctuaries Act of 1972, 33 U.S.C. §§ 1401 et seq. (Ocean Dumping Act), which forms the basis for federal regulation of dumping of all types of materials into ocean waters. The Act provides that the Administrator of EPA (Administrator) may issue dumping permits and, acting pursuant to Section 102 of the Ocean Dumping Act (33 U.S.C. § 1412), the Administrator published Interim Ocean Dumping Regulations on April 5, 1973 (38 Fed.Reg. 8726), 40 C.F.R. §§ 220 et

---

* Sitting by designation pursuant to 28 U.S.C. § 292.

1. New Jersey has moved to intervene as a party defendant. The motion was filed on the eve of argument. Although given an opportunity to file a further statement of its views, New Jersey failed to do so, and its interests were fully represented by defendants. Accordingly, the motion to intervene is denied at this time.

*seq.* and Criteria on May 16, 1973 (38 Fed. Reg. 12872), 40 C.F.R. §§ 227 *et seq.* These regulations set forth the procedures with which an applicant for an ocean dumping permit must comply and established the criteria for the review and evaluation of permit applications by EPA and designation of ocean dumping sites to be utilized on an interim basis.

Resolution of these motions requires a detailed explanation of the administrative actions taken and procedures used. The Ocean Dumping Act became effective on April 23, 1973. Prior to this date both Philadelphia and Camden had each been dumping sewage sludge in substantial quantity for many years at the Cape Henlopen site in the Atlantic Ocean, 13.8 nautical miles due east of Delaware.

On April 23, 1973, after publication of notice and following a public hearing, EPA issued an interim ocean dumping permit to Philadelphia. This permit was valid until October 23, 1973, or until the ninetieth day after promulgation of Final Ocean Regulations, whichever date occurred first, and, among other things, required Philadelphia to move its dumping activities approximately 35 miles east from the Cape Henlopen site to the Cape May site.

On April 27, 1973, again after notice and public hearing, EPA also issued an interim ocean dumping permit to Camden for a ninety-day period, which was renewed on July 30, 1973. This renewed Camden permit, like the Philadelphia permit, was valid for a period of six months or 90 calendar days after the promulgation of Final Ocean Dumping Regulations, whichever date came first. As it had done with Philadelphia, EPA also required Camden to move its dumping activities to the Cape May site.

On October 15, 1973, EPA published Final Ocean Dumping Regulations and Criteria (38 Fed.Reg. 28610), 40 C.F.R. §§ 220 *et seq.*, which provided that there would be no immediate changes in the list of approved dumpsites and that all permits granted under the interim regulations and which would otherwise expire would be extended to February 13, 1974. Because both Phila-

delphia's and Camden's permits were in this category, this grandfather provision of the Final Regulations operated to extend both permits until February 13, 1974.

After some administrative delays, EPA extended Camden's July 30, 1973, permit indefinitely. Thereafter, on May 20, 1974, and following notice and a public hearing convened June 20, 1974, EPA issued a new interim ocean dumping permit to Camden for the Cape May site on August 21, 1974, valid for one year.

In accordance with the Final Regulations, EPA also issued a second interim permit to Philadelphia for one year on February 13, 1974. In November, 1974, Philadelphia applied to renew its interim permit due to expire in February, 1975, and, by subsequent amendment to its application, requested permission to increase the volume of sludge to be dumped. After notice and public hearing held January 14, 1975, EPA on February 14, 1975, issued another interim ocean dumping permit to Philadelphia. This permit limited the amount of sludge which Philadelphia could dump to 150 million gallons and prescribed a plan to find alternatives to this method of sludge disposal that included research and implementation of various specified disposal methods. The permit also contained several special conditions, one of which required Philadelphia to reduce ocean dumping by fifty percent by the end of 1978 and totally cease ocean dumping by the end of 1980.

By letter of February 27, 1975 (incorrectly dated as March 27, 1975), immediately following the issuance of the interim permit, a representative of Philadelphia stated that, in order "to obviate the necessity of instituting formal litigation" in federal court, Philadelphia demanded an adjudicatory hearing before the Administrator of EPA to challenge, among other things, the condition in the permit requiring cessation of ocean dumping.

Although EPA's regulations pertaining to the issuance of ocean dumping permits provide no formal procedures for such an appeal, the Administrator granted Philadelphia's request. The Administrator appoint-

ed a hearing panel which subsequently held a seven-day hearing in Washington, D. C. between May 19 and May 28, 1975.

Plaintiff in the present action was involved in discussions which preceded Philadelphia's request for a hearing. Other parties that participated in the hearing, in addition to the State of Maryland, were National Wildlife Federation, Environmental Defense Fund, State of Virginia, Delaware Valley River Basin Commission, Town of Ocean City, Maryland, and Mr. Rignal Baldwin. All parties presented evidence. Representatives from the Department of Agriculture testified as expert witnesses on alternative uses of sewage sludge. In addition, witnesses from Woods Hole Oceanographic Institute; EPA's Rhode Island, Annapolis, and Oregon Laboratories; the Virginia Institute of Marine Science; the Food and Drug Administration; the State of Maryland; Metropolitan Sanitary District of Greater Chicago; Raytheon Corporation; and several universities testified over seven days, and numerous exhibits were received as well as lengthy briefs. The Philadelphia proceeding became a forum for review of the scientific evidence relating to the Cape May site as well as for general analyses of the many ways in which sewage sludge can be used or disposed of. The hearings examined the scientific difficulties encountered in monitoring deep marine ecological interactions and evaluating potential dangers to the waters of the northeast coast of the United States should dumping of sewage sludge continue unabated.

On September 19, 1975, the hearing panel filed a 65-page report and made extensive findings of fact and conclusions of law based upon the record. The report concluded that while Philadelphia's dumping had not been shown to have caused harm at the Cape May site, there was sufficient cause for concern to order a general phasing out of Philadelphia's ocean dumping. The report also concluded that there were alternative means of disposal available but further investigation was necessary to determine the most appropriate method. Pending this final resolution, the panel recommended

that issuance of the Philadelphia permit, as conditioned, be affirmed (except for condition 3, relating to amounts, which was recommended for reconsideration).

On September 25, 1975, the Administrator adopted the panel's recommendations in an eight-page decision which stated:

It is obvious that even assuming no harm has occurred at this point in time, the City has not shown that its continued dumping will not contribute to a general deterioration of the ocean or that such deterioration will not eventually cause adverse effects. It is significant that the scientists testifying at the hearing, while acknowledging the limitations on the present levels of knowledge to identify harm, expressed grave concern over the continued accumulation of pollutants in any ocean area, and the waters off the highly populated East Coast in particular. As has been observed, the ocean is not an infinite sink.

I believe that such potential harm is what Congress meant to include when it extended the Act to consideration of endangerment of the ocean. Certainly, there are degrees of potential harm, some calling for immediate action and others allowing more gradual implementation of remedial action. The record here does not show a need for immediately terminating the discharge but is sufficient to confirm the appropriateness of the Regional Administrator's schedule as a reasonable time period to insure that the dumping does not result in irreversible harm.

Maryland, a party to the Philadelphia hearing, has not challenged the decision of the Administrator in the Philadelphia matter.

While the Philadelphia proceeding was in progress, Camden filed an application to review its interim permit (due to expire August 21, 1975) to allow dumping of a yearly maximum of 15 million gallons of sludge at the same Cape May site.

On November 11, 1975, EPA issued a new one-year permit to Camden. Included among the permit conditions was the requirement that Camden also cease ocean

dumping, but by the end of 1979, one year earlier than Philadelphia. Apparently because the findings as to alternatives and effects of ocean dumping made during the extensive Philadelphia hearing were believed to be equally applicable to the Camden situation, EPA issued this Camden permit without a hearing.

Immediately thereafter, on November 26, 1975, Maryland filed the complaint in this case challenging the Camden permit. Subsequently, EPA suggested to plaintiff's counsel that in lieu of litigation a hearing similar to the Philadelphia hearing could be convened in Washington, D. C., to consider what new evidence Maryland may have bearing on the issuance of the interim permit to Camden. However, counsel for Maryland refused this suggestion. The offer was renewed by defendants at oral argument and again rejected.

Defendants contend that they have complied with all requirements of the Act and its implementing regulations, issuing permits only after adequate notice and acting always consistently with appropriate environmental and other applicable standards and on substantial data.

Maryland contends otherwise. The issues presented are:

(1) Whether an Environmental Impact Statement relating to the site and Camden permit should have been prepared and circulated pursuant to the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 et seq.

(2) Whether the Ocean Dumping Act requires a hearing prior to the issuance of each interim permit and site selection.

(3) Whether the defendants acted arbitrarily and unreasonably in approving the continued dumping by Camden without adequate consideration of alternatives and the characteristics of the sludge involved.

The Court has determined that no Environmental Impact Statement was required but that the Camden permit should not have issued without a hearing. However, under all the facts and circumstances presented, the Court in the exercise of equi-table discretion declines to issue an injunction immediately halting Camden's dumping at Cape May. Accordingly, defendants shall be directed to conduct a public hearing in conformity with the standards and procedures discussed below, and to this extent summary judgment shall be entered for plaintiffs. In all other respects, defendants' motion for summary judgment is granted.

**I.**

There was no Environmental Impact Statement circulated in accordance with the requirement of NEPA relating to the dumping of sewage sludge by Camden at Cape May. Since this is admittedly a "major Federal action significantly affecting the quality of the human environment," Maryland urges that the entire action is illegal. Defendants contend an Environmental Impact Statement is not required in enforcement of the Ocean Dumping Act since that Act provides the functional equivalent, making NEPA requirements "redundant and wasteful."

Neither the Ocean Dumping Act nor the agency's implementing regulations require by their terms an Environmental Impact Statement. EPA takes the view that an Environmental Impact Statement is not necessary where the agency undertakes environmentally protective regulatory activities and its regulations do not provide that an Impact Statement must be prepared. (40 C.F.R. § 6.106(b) (1975); 40 C.F.R. § 6.13(b) (1973)).

The issue need not be labored. A host of cases support EPA's position based on functional equivalence. See Wyoming v. Hathaway, 525 F.2d 66 (10th Cir. 1975); Amoco Oil Co. v. EPA, 163 U.S.App.D.C. 162, 501 F.2d 722 (1974); Environmental Defense Fund, Inc. v. EPA, 160 U.S.App.D.C. 123, 489 F.2d 1247 (1973); Essex Chemical Corp. v. Ruckelshaus, 158 U.S.App.D.C. 360, 486 F.2d 427 (1973), cert. denied, 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974); Portland Cement Ass'n v. Ruckelshaus, 158 U.S.App.D.C. 308, 486 F.2d 375 (1973), cert. denied, 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d

226 (1974), *subsequent appeal,* 168 U.S.App. D.C. 248, 513 F.2d 506 (1975); *Anaconda Co. v. Ruckelshaus,* 482 F.2d 1301 (10th Cir. 1973); *Buckeye Power, Inc. v. EPA,* 481 F.2d 162 (6th Cir. 1973), *subsequent appeal,* 523 F.2d 16 (6th Cir. 1975); *Duquesne Light Co. v. EPA,* 481 F.2d 1 (3rd Cir. 1973), *subsequent appeal,* 508 F.2d 743 (3d Cir. 1975), *subsequent appeal,* 522 F.2d 1186 (3d Cir. 1975); *International Harvester Co. v. Ruckelshaus,* 155 U.S.App.D.C. 411, 478 F.2d 615 (1973); *Appalachian Power Co. v. EPA,* 477 F.2d 495 (4th Cir. 1973). While these decisions involve a similar issue under comparable environmental statutes, *e. g.* The Clean Air Act, 42 U.S.C. §§ 1857 *et seq.,* and the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. §§ 135 *et seq.,* no basis appears for a contrary rule in the instance of the Ocean Dumping Act. It is also significant that 33 U.S.C. § 1371(c) of the Federal Water Pollution Control Act Amendments of 1972 contains specific language not exempting EPA from compliance with NEPA in issuing permits for the discharge of pollutants, while other statutes in the environmental area, including the Ocean Dumping Act, contain no such provision.

■ Where federal regulatory action is circumscribed by extensive procedures, including public participation, for evaluating environmental issues and is taken by an agency with recognized environmental expertise, formal adherence to the NEPA requirements is not required unless Congress has specifically so directed. Thus, proper interpretation of the Ocean Dumping Act does not require EPA to prepare or circulate an Environmental Impact Statement.

## II.

■ As previously noted, the 1975 permit to Camden for dumping at the Cape May site was granted without a public hearing. EPA considered this unnecessary because of the voluminous record made in the Philadelphia hearing and because of its well-founded belief that no immediate alternative was available other than dumping in the Delaware River, which was environmentally wholly unacceptable. Appropriate findings were made to support the permit, but without a hearing.

This action must be rectified. Whatever discretion the Administrator may have to dispense with a hearing is narrowly circumscribed, *see* Sen.Rep.No.92–451, 92d Cong., 1st Sess. 20 (1971) ("Before issuing the permit, the Administrator must give notice and an opportunity for public hearings. . . If the Administrator determines that a new question is presented, that the implications of granting or denying a permit are significant, or that there is substantial public interest in the application, it is intended that he will hold a public hearing before determining whether a permit shall be issued and if so, what the terms of the permit should be."). The Ocean Dumping Act requires a hearing under the circumstances of this case, and opportunity for public comment is essential in any event if, as the Court has held, procedures under this Act provide the equivalence necessary to obviate the need for an Environmental Impact Statement. While the Philadelphia record may have been sufficient to meet the hearing requirement in some particulars, it is apparent that there was no consideration given in that hearing either to possible alternatives on land or elsewhere in the ocean available to Camden for its sludge disposal or to whether Camden sludge is in certain respects subject to further treatment before dumping under applicable regulations.

EPA considered this a purely useless inquiry because of information available to it concerning Camden's situation and because of the prior selection of the Cape May site. This did not, however, avoid the need to conduct a hearing and the Administrator was without discretion to skip this essential step in the process.

■ It is therefore necessary at this stage to consider what type of hearing is required, since the parties are in obvious disagreement on this point. As already indicated, after the complaint in this action was filed, EPA advised Maryland it would hold a hearing if Maryland wished to present any data relating to Camden.

Maryland refused, apparently on the mistaken notion that EPA has a legal obligation to present at a hearing evidence subject to adversary attack which would affirmatively justify the authorization given Camden. This misconstrues EPA's obligation under the Act. *See* Sen.Rep.No.92–451, 92d Cong., 1st Sess. 20 (1971). Before any hearing is announced, EPA must first receive an application from Camden and tentatively determine that the applicant has satisfied the standards laid down in EPA's regulations governing the proposed ocean dumping. It may reach this tentative conclusion solely upon the application itself and other data available to the agency.

It is at this stage that other interested persons must be notified and given an opportunity to challenge EPA's tentative conclusions either directly through the testimony of witnesses or by presenting in writing further information as to alternatives or other aspects of the application as tentatively approved. EPA must take data thus presented into account before reaching its final decision. There is, however, nothing in the statutory scheme developed by Congress which supports the view that an interested party such as Maryland can force EPA to hold an adversary hearing where Camden must come forward with witnesses and documentary proof to justify its application establishing the underlying facts and unavailability of alternatives, to which Maryland as an interested party can object in adversary fashion. Such a process surely is not required where immediate measures must be taken to deal on an interim basis with sludge that cannot be stored awaiting the endless cumbersome processes of quasi-judicial adversary determinations, as Congress was well aware.

■ Since a public hearing was not held in 1975, prior to extending Camden's permit, summary judgment must be granted Maryland to this extent. Defendants will be directed promptly to notice and conduct a public hearing relating to Camden's permit application at which Maryland and other interested parties may submit comments and supporting data supplemental to the prior Philadelphia and Camden records or seek clarification of any aspect of the matter.[2]

■ Maryland urges that much more far-reaching relief is warranted, for it seeks an injunction prohibiting Camden from dumping sludge at the Cape May site on the ground that proper procedures have not been followed. Such a prohibition is wholly inappropriate, given the facts revealed by the record and the dumping apparently required under the circumstances. The administrative record dealing with Camden's applications and permits for 1973–75, which is of record in this case, reflects the concern and critical scrutiny brought to bear by EPA. The agency is certainly familiar with the problem of ocean dumping since, in addition to its general experience and expertise, it has held three public hearings on Philadelphia and two on Camden. Camden's applications for these years generally provided sufficient information, including discussions of alternatives, on which EPA could base its decisions, and the agency several times required Camden to furnish additional material it deemed necessary. EPA consistently considered and made determinations as to the characteristics of the waste and the availability of alternatives to ocean dumping. Even after the permits were issued, Camden was subject to various requirements of regular analysis of the

**2.** In addition to its contention concerning EPA's failure to hold a hearing prior to the issuance of the 1975 Camden permit, Maryland also complains that no hearing has ever been held on the designation of Cape May as the appropriate site for dumping by Camden. EPA did specify Cape May as one of the possible dumping sites in its 1973 notice and hearing on Philadelphia, *see* Affidavit of William C. Muir; Affidavit of George D. Pence, Jr., and both Philadelphia and Camden have been using

Cape May since 1973, with Philadelphia dumping the far greater quantity of sludge. Although it is of course too late for Maryland to obtain relief as to the 1973 and 1974 Camden permits, the public hearing which EPA must now hold on the 1975 Camden permit will also afford Maryland and other interested parties an opportunity to present their positions on why Cape May is an inappropriate site for dumping by Camden.

sludge and monitoring at the site. The city was also under a continuing duty to consider, develop and report on alternative methods of waste disposal, and EPA kept a watchful eye on the progress and feasibility of these alternatives. Moreover, although subsequent to the issuance of the 1975 Camden permit, EPA has now considered and apparently rejected the alternatives proposed by Maryland in its submission of January 2, 1976. In conjunction with EPA's knowledge of other environmental problems besetting Camden, some of which are detailed in the administrative record, this background makes clear the apparent lack of immediate alternatives to ocean dumping, and on the present record EPA was certainly justified in its belief that if Camden were prevented from dumping sludge at Cape May it would at this point be forced to dump in the Delaware River which would create very serious and immediate health and pollution problems.

Accordingly, while a hearing must be conducted, there is no reasonable prospect that such a proceeding will immediately change the interim resolution of the overall sludge dumping problem that defendants have developed as a temporary measure. The merits of this litigation and the public interest dictate that Camden be allowed to continue to use Cape May under its present authorization pending completion of the hearing.

Judgment shall be entered for defendants in all respects except on the claim that no hearing was required in 1975 prior to the issuance of Camden's present dumping permit. Hearings of the type indicated being legally required, judgment shall be entered in this respect for Maryland but in all other respects Maryland's prayer for relief is denied.